**THIRD DIVISION**
**DOYLE, P. J.,**
**REESE and BROWN, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT.  ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**June 30, 2021**

# In the Court of Appeals of Georgia

A21A0198. WELLS v. WELLS-WILSON.

A21A0199. MAGWELL, LLC v. WELLS-WILSON.

A21A0229. FIRST NOLIA ENTERPRISES, INC. v. WELLS-WILSON.

BROWN, Judge.

In these related appeals, D. Richard Wells, Magwell, LLC, and First Nolia Enterprises, Inc. separately appeal from a trial court's order vacating an arbitration award and returning the case to the arbitrator for a limited rehearing.[1] Each appellant

---

[1] The trial court's order "is deemed final for appeal purposes even though it is undisputed the case must be returned to the arbitrator for rehearing." *Amerispec Franchise v. Cross*, 215 Ga. App. 669 (452 SE2d 188) (1994). See also OCGA § 9-9-13 (e) ("Upon vacating an award, the court may order a rehearing and determination of all or any of the issues either before the same arbitrators or before new arbitrators appointed as provided by this part. . . . The court's ruling or order under this Code section shall constitute a final judgment and shall be subject to appeal in accordance with the appeal provisions of this part.").

asserts altogether different enumerations of error, while also incorporating by reference each of the enumerations of the other two appellants. We will therefore combine the arguments and enumerations of error set forth in Case Nos. A21A0198, A21A0199, and A21A0229 and address them as a whole below. The appellants collectively assert ten enumerations of error regarding the arbitrator overstepping his authority and manifestly disregarding the law in a variety of ways and alleged errors in the trial court's order for rehearing. For the reasons explained below, we affirm in part, vacate in part, and remand these cases with direction.

> The function of the trial court in proceedings to confirm or vacate an arbitration award should be severely limited in order not to frustrate the purpose of avoiding litigation by resorting to arbitration. Consistent with this policy, OCGA § 9-9-13 (b) of the Georgia Arbitration Code sets forth five exclusive statutory grounds for vacating an arbitration award upon the application of a party subject to the award:
>
> > (1) Corruption, fraud, or misconduct in procuring the award; (2) Partiality of an arbitrator appointed as a neutral; (3) An overstepping by the arbitrators of their authority or such imperfect execution of it that a final and definite award upon the subject matter submitted was not made; (4) A failure to follow the procedure of [the Georgia Arbitration Code], unless the party applying to vacate the award continued with the arbitration with notice of this

2

failure and without objection; or (5) The arbitrator's manifest disregard of the law.

The fact that the relief was such that it could not or would not be granted by a court of law or equity is not ground for vacating or refusing to confirm the award.

The authority of courts to review an award, pursuant to a motion to vacate, is very limited; courts cannot inquire into the merits of an arbitrable controversy; arbitrators are free to award on the basis of broad principles of fairness and equity; and an arbitrator need not make findings or state the reasons in support of the award. [When] reviewing a motion to vacate, appellate courts cannot make determinations as to the sufficiency of the evidence, as such judicial intervention would only frustrate the purpose of arbitration. The prohibition against considering the sufficiency of the evidence as grounds for vacating an arbitration award is unconditional. Therefore, a reviewing court is prohibited from weighing the evidence submitted before the arbitrator, regardless of whether the court believes there to be sufficient evidence, or even any evidence, to support the award.

(Citations, punctuation, and footnote omitted.) *A&M Hospitalities v. Alimchandani*,

Ga. App. (3) (856 SE2d 704) (2021). "In reviewing a trial court's order confirming

3

an arbitration award, this Court will affirm unless the trial court's ruling was clearly erroneous." (Citation and punctuation omitted.) *First Option Mtg. v. S&S Financial Mtg. Corp.*, 322 Ga. App. 14 (743 SE2d 574) (2013). Our research revealed no Georgia decision outlining a specific standard of appellate review of a trial court's order vacating an arbitrator's award and ordering a rehearing under OCGA § 9-9-13 (e). The Eleventh Circuit Court of Appeals has stated generally with regard to the standard of review: "On an appeal of a district court's decision to confirm or vacate an arbitration award, we review the district court's resolution of questions of law de novo and its findings of fact for clear error." (Citation and punctuation omitted.) *EGI-VSR v. Mitjans*, 963 F3d 1112, 1121 (III) (11th Cir. 2020). As this Eleventh Circuit standard comports with numerous Georgia decisions that appear to apply a de novo standard of review on questions of law without so stating,[2] and clarifies the specific circumstance under which we will reverse the trial court on the ground that it has clearly erred,[3] we will apply this standard of review in this case.

_____

[2] See, e.g., *A&M Hospitalities*, Ga. App. at (3); *King v. King*, 354 Ga. App. 19, 23-29 (2) (840 SE2d 108) (2020).

[3] For example, a clearly erroneous standard of review should be applied when a trial court rules on a hotly contested issue regarding whether an arbitrator attempted to solicit business from one of the party's attorneys during a recess in the arbitration. See *Doman v. Stapleton*, 272 Ga. App. 114, 118 (2) (611 SE2d 673) (2005).

As the relevant facts are complicated and the proceedings below convoluted,[4]

[4] Our ability to ascertain the course of the proceedings in the arbitration has been made more difficult by how portions of the record from the arbitration were made a part of the record in the superior court. Rather than having correspondence, filings, and rulings transmitted in chronological order at one time, appellants filed piecemeal notices of filing that included multiple documents from the arbitration with new superior court exhibit numbers. The record index from the superior court then lists only a generic "Notice of Filing" for each such filing, even though each contains multiple different documents from the arbitration. See, e.g., "Notice of Filing Appendix of Exhibits (Volume 3)" filed below on February 24, 2020, followed by 14 separate exhibits spanning 178 pages of the record. To their credit, counsel for Richard Wells included a novel section in his appellate brief titled, "Citation to the Parts of the Record and Transcript Essential to this Appeal," which appears to list some of the relevant documents in chronological order. The record also includes a list of "Selected Arbitration Filings" that was attached as an exhibit to a brief filed by Susan Wells-Wilson below.

While Richard Wells asserts in his brief that "[t]he record transmitted to this Court on appeal includes all arbitration transcripts, procedural orders, motions, and key correspondence," our review of the record shows that all exhibits and filings before the arbitrator were *not* made a part of the record before the superior court. For example, the arbitrator's "Second Interim Award and Injunction," states that on January 3, 2020, Susan Wells-Wilson filed a "Reply Brief in Support of a Proposed Injunction," but we cannot locate that brief in the record before us. Likewise, the documents referenced in the transcript by exhibit number are not included with the transcripts filed in the superior court. Susan Wells-Wilson's counsel explained to the arbitrator on the first day of the hearing that there were "two volumes of claimant exhibits which were numbered 1 though 99," along with a "joint exhibit binder which is a smaller one . . . [numbered] 1 to 11," and a third binder of respondent exhibits numbered 1 through 14. As courts do not review the sufficiency of the evidence to support an arbitration award, *Greene v. Hundley*, 266 Ga. 592, 594, n.5 (468 SE2d 350) (1996), these record issues do not preclude our consideration of the grounds asserted to vacate the arbitrator's award under the Georgia Arbitration Code in this particular case. Cf. *Gainesville Mechanical v. Air Data*, 350 Ga. App. 614 (829 SE2d 838) (2019); *Patterson v. Long*, 321 Ga. App. 157, 162 (1) (b) (741 SE2d 242)

we will provide a brief, initial overview before providing more detailed facts in our analysis of each enumerated error. Richard Wells, Susan Wells-Wilson, and Linda Palmer are siblings; their parents, now deceased, formed Magnolia Advanced Materials, Inc. ("Magnolia") which manufactures epoxies. Until 2008, the majority of Magnolia's stock was owned by non-party Nolia Enterprises, L.L.L.P. ("Nolia Partnership"); its general partner was First Nolia Enterprises, Inc. ("First Nolia"). As Richard Wells owned 100 percent of First Nolia's stock, he "was able to control the manner in which the Magnolia stock held by [the] Nolia [Partnership] was voted."

In anticipation of a 2008 sale of Magnolia, the parties finalized an "Operating Agreement" creating a new entity, Magwell, LLC, ("Magwell") and naming First Nolia as the initial manager of Magwell. On the same day, Nolia Partnership's stock was transferred to Magwell. The Operating Agreement provided for arbitration pursuant to the "commercial arbitration rules then in effect of the American Arbitration Association" and stated that the Operating "Agreement and the

_____

(2013), disapproved on other grounds, *Johns v. Suzuki Motors of America*, 310 Ga. 159, 165-166 (4) (b) (850 SE2d 59) (2020). Compare *Brazzel v. Brazzel*, 337 Ga. App. 758, 762-763 (2) (a) (789 SE2d 626) (2016) (holding the superior court did not err by finding that the lack of a complete arbitration transcript was a basis for denying the motion to vacate based upon an arbitrator's alleged failure to rule on a submitted issue).

application or interpretation hereof shall be governed exclusively by the laws of the State of Georgia, without regard to its conflicts of law principles." It was agreed to by the Nolia Partnership as the "Initial Member" through First Nolia, the General Partner of Nolia Partnership, and signed by Richard Wells, in his capacity as the chief executive officer of First Nolia. The plan was for Magwell to be completely dissolved after the sale and distribution of money. The sale never took place.

Following subsequent disputes between the siblings regarding voting rights, Susan Wells-Wilson commenced a commercial arbitration in 2018, naming Richard Wells, Linda Palmer, Magwell, and First Nolia as respondents. She asserted claims for declaratory judgment, breach of contract, breach of the implied covenant of good faith and fair dealing, and stubborn litigiousness under OCGA § 13-6-11. In her prayer for relief, she sought damages, interest, attorney fees, and declaratory and injunctive relief. She summarized her claim for arbitration as one

> concern[ing] the rights of the members of Respondent Magwell . . . to vote the corporate stock that Magwell holds in a family-owned corporation named Magnolia . . . . Two of the Respondents in particular, First Nolia . . . and Ric[hard] Wells, have attempted to deprive . . . Susan Wells-Wilson [ ] of her rights to vote her ownership interests with respect to that stock in accordance with her ownership interests under the Magwell Operating Agreement. They, along with Magwell, have

7

also refused to recognize the new board of directors elected by the shareholders of Magnolia . . . at the annual shareholders meeting held on October 15, 2018.

After the arbitrator issued a Final Award on February 12, 2020, Susan Wells-Wilson asked the Superior Court of Fulton County to confirm the arbitration award, and Richard Wells, Magwell, and First Nolia counterclaimed with requests to vacate the final award, as well as previous awards issued by the arbitrator.[5] The Business Case Division of the Superior Court of Fulton County subsequently issued a ten-page order concluding that no statutory ground existed to vacate the arbitrator's decision regarding the contract issues presented by the parties. But, based upon its decision to vacate that portion of the award which "effectively enjoins Magwell from retaining and paying legal counsel to represent it in this matter," as well as the portion that "fails to identify the amount of fees and expenses incurred on behalf of each of the Respondents," the trial court vacated the entire arbitration award and ordered the arbitrator to rehear only specific issues related to attorney fees and expenses that will be discussed in more detail below. Richard Wells, First Nolia, and Magwell have

---

[5]Although Linda Palmer was named as a respondent in Susan Wells-Wilson's application to confirm, she did "not oppose [Susan Wells-Wilson]'s request," and agreed that Susan Wells-Wilson "is entitled to the relief so requested."

8

appealed from this order; Susan Wells-Wilson and Linda Palmer have filed separate appellee briefs.

1. *Alleged Untimeliness of Successive Awards*. First Nolia contends that "[t]he trial court erred when it did not specifically vacate successive arbitration awards issued more than thirty days after the hearing closed." It asserts that both the Georgia Arbitration Code, OCGA § 9-9-1 et seq., and the American Arbitration Association ("AAA") Commercial Rules require an arbitrator to issue an award within 30 days after a hearing closes.

The Georgia Arbitration Code "was designed to preserve and ensure the efficacy and expediency of arbitration awards." *ABCO Builders v. Progressive Plumbing*, 282 Ga. 308 (647 SE2d 574) (2007). Except for certain exceptions not applicable here, it applies to "all disputes in which the parties thereto have agreed in writing to arbitrate and shall provide the exclusive means by which agreements to arbitrate disputes can be enforced." OCGA § 9-9-2 (c). "A trial court shall vacate an arbitration panel's award only if it finds that a party was prejudiced by one of four bases, including an 'overstepping by the arbitrators of their authority.' OCGA § 9-9-13 (b) (3). [Cit.]" *Conmac Corp. v. Southern Diversified Dev.*, 245 Ga. App. 895, 896 (1) (a) (539 SE2d 532) (2000). OCGA § 9-9-10 (b) provides:

An award shall be made within the time fixed therefor by the agreement or, if not so fixed, within 30 days following the close of the hearing or within such time as the court orders. The parties may extend in writing the time either before or after its expiration. A party waives the objection that an award was not made within the time required unless he notifies in writing the arbitrators of his objection prior to the delivery of the award to him.

In this case, the trial court found "no support for [appellant]s' contention that their rights were prejudiced by failure on the part of the arbitrator to follow proper procedure."

Before addressing the arguments raised by First Nolia, we will first examine the procedural history of the arbitrator's awards. On December 18, 2018, the arbitrator held an initial case management conference attended by a representative of AAA, Richard Wells, and attorneys representing Susan Wells-Wilson, Linda Palmer, Richard Wells, Magwell, and First Nolia. All counsel agreed that the arbitrator had "jurisdiction over the dispute in its current form" and that all parties were bound by "the arbitration provision."

"Procedural Order 1," issued by the arbitrator on December 21, 2018, included the following directives: "To the extent additional matters are put in issue, the Parties may make a timely challenge to the jurisdiction of the Arbitrator over any additional

claims or defenses"; "Subject to Rule 6," Susan Wells-Wilson was required to file a motion to seek leave "to amend her statement of claim"; "The Arbitrator will issue a written award in accordance with the Rules"; "The Arbitrator currently contemplates that an interim award will first be made after which submissions regarding attorneys fees *and any other remaining matters* will be made"; "In the final award, the Arbitrator will resolve all issues raised by the Parties and shall present findings of fact and conclusions of law in support of his conclusions"; "The parties will have until January 7, 2019 to object or seek amendment to this Procedural Order 1." (Emphasis supplied.) Appellants point to no objection to Procedural Order 1 in the voluminous record before us.[6]

---

[6] In an affidavit submitted in connection with appellants' request that the trial court vacate the arbitration award, their counsel averred:

> At the preliminary conference, the parties discussed that the arbitrator would render an award on the merits and reserve the calculation of attorneys' fees until after the award was entered. The first award was to include a ruling on the merits and the entitlement to attorneys' fees. No mention was ever made of the arbitrator retaining jurisdiction following the merits award to award additional relief or to take additional briefing except as to the subject of attorneys' fees. Magwell, First Nolia, and Wells did not agree to allow the arbitrator to continue jurisdiction for additional briefing and to award injunctive relief.

11

The arbitrator held evidentiary hearings on July 22, 2019 through July 24, 2019 and October 1, 2019. After the parties finished presenting evidence on October 1, 2019, the arbitrator advised that he

> contemplate[d] that [he] will issue an interim award that deals with the various issues pertaining to the merits and also deals with attorneys' fees, at least the entitlement to attorneys' fees but not the amount of attorneys' fees. . . . We'll set aside the amount of attorneys' fees for later. And we can discuss at the appropriate time how that's done. My own hope is that you can simply exchange paperwork, exchange your billing records and make a decision — you know, come to an agreement about what's reasonable. But if we have to have an evidentiary hearing about the amount of attorneys' fees, we can schedule that. Does that work for everybody?

Counsel for the parties then agreed. On October 2, 2019, the parties presented oral argument, and the arbitrator stated again at the end of the hearing that he would try to prepare an "interim award" by the end of November. "And then at that point there will be some disposition made of the attorneys' fees issues as well as other issues in the case, the merits issues." Nothing was mentioned at the end of this hearing as to whether it would remain open or closed. Later that day, the arbitrator sent an email to counsel stating: "The evidentiary hearing on the merits is complete and the parties

12

have rested. . . . I plan to prepare a partial award dealing with the merits of the dispute and the entitlement to attorneys' fees."

On November 14, 2019, an administrative representative of AAA sent a letter to the parties via email stating:

> The hearings are declared closed as of November 1, 2019 and the Arbitrator shall have until December 2, 2019 to render the Interim Award referenced in the Arbitrator's email of October 2, 2019. Please be reminded any direct exchange with the Arbitrator is terminated. All communications shall be directed to the AAA.

(Punctuation omitted.) The letter indicates that the arbitrator was provided with a copy of it. On the same day, joint counsel for Richard Wells, Magwell, and First Nolia sent the following email to the AAA representative: "I have one question for clarification. We had understood that [the arbitrator] would issue an interim award on the merits and entitlement to attorneys' fees, and then decide attorneys' fees thereafter, culminating in a final award. Does that require the record to remain open to decide the fee issue?" The arbitration representative replied, "The Interim Award will allow for the submittal of any submissions [the arbitrator] requests."

On November 27, 2019, the arbitrator issued a 53-page decision titled "Interim Award," with an introduction stating:

13

This Interim Award disposes of issues related to entitlement to declaratory and injunctive relief, damages[,] and attorney's fees. Based on the record and submission[s] of counsel and for the reasons discussed below, I find that clear and convincing evidence supports declaratory and injunctive relief and an award of legal expenses in favor of the Claimant. The form of any injunctive relief and the amount of attorneys' fees to be awarded will need to be determined based on additional submissions and, if necessary, after additional hearings. Jurisdiction is retained pending a final award.

On the final pages of the Interim Award in a section titled "Relief," the arbitrator stated, in pertinent part:

1. Susan is entitled to the following declaration: The right to vote shares in Magnolia . . . owned by . . . Magwell . . . belongs to the owners of Magwell in proportion to their ownership.

2. The question of injunctive relief, if any, regarding the enforcement of this declaration, including as it relates to item 5 below, is deferred.

. . .

4. In accordance with Section 10.11 of the Operating Agreement [the arbitration clause] , Susan is entitled to an award of attorneys' fees and expenses against Rick together with fees and charges

14

paid and advanced to the [AAA]. A determination of the amount to be paid by Rick to Susan is deferred.

5.     Rick is not entitled to indemnity or payment of costs, advances, fees, or expenses under Section 6.05 of the Operating Agreement. Rick will be required to reimburse Magwell to the extent he has charged Magwell for costs, advances, fees or expenses related to this arbitration. This reimbursement will inure to the benefit of all Magwell unit holders, including Linda.

6.     Directions and dates for further proceedings are being provided in a contemporaneous procedural order.

7.     Jurisdiction is retained pending a final award.

(Footnote and emphasis omitted.)

"Procedural Order 5," issued on the same date as the Interim Award, set dates for the parties to submit briefs regarding "a draft form of injunction, including but not necessarily limited to the restoration of funds to Magwell, LLC," as well as a January 2, 2020 deadline for the parties to report to the arbitrator as to whether the parties believed a hearing was necessary with regard to the form of the injunctive relief, and a provisional hearing date of January 7, 2020. Based upon his assumption that attorney fees and expenses were "continuing to accrue," the arbitrator stated that a

determination of the amount of attorney fees and expenses of arbitration, would be deferred until the form of injunctive relief had been determined.

Fourteen days later, on December 9, 2019, Susan Wells-Wilson submitted a proposed form of injunctive relief and asked "that the declaration in the Interim Award be clarified to ensure that the right to vote Magnolia stock owned by Magwell rests with its *members* in proportion to their respective ownership interests." (Emphasis supplied.) The arbitrator stated in the Interim Award that "[t]he right to vote shares in Magnolia . . . owned by . . . Magwell . . . belongs to the *owners* of Magwell in proportion to their ownership." (Emphasis supplied.) Later that month, appellants filed objections to Susan Wells-Wilson's request for clarification, citing OCGA § 9-9-11, the portion of the Georgia Arbitration Code section outlining the grounds and timing for a modification of an arbitration award. On December 30, 2019, the arbitrator issued an order captioned "Disposition of Application for Clarification of Interim Award and Amended Interim Award" and ordered that "the Interim Award is amended to replace 'owners' in paragraph 1 on page 52 with 'Members.' Otherwise the Interim Award is not altered at this time. The amended language will appear in a final award. Jurisdiction is retained pending a final award."

16

On December 20, 2019, the appellants objected "to the Arbitrator's continuing jurisdiction to award substantive relief on the merits of this case in the form of specific injunctive relief." They pointed out that they already had "addressed injunctive relief in post-hearing briefs" and that "the [a]rbitrator failed to render a complete decision on the merits by failing to determine the scope and substance of any . . . injunctive relief to be granted." In their view, the arbitrator's continuing jurisdiction was limited to the calculation and award of attorney fees.

On January 7, 2020, the arbitrator held a hearing, addressing in large part whether a bond would be required if a portion of the injunctive relief requested by Susan Wells-Wilson were granted, and if so, an appropriate amount. The parties also presented abbreviated argument regarding the proposed injunction submitted by Susan Wells-Wilson. On January 13, 2020, the arbitrator issued a "Second Interim Award and Injunction" explaining that his November 27, 2019 Interim Award "disposed of issues related to entitlement to declaratory and injunctive relief, damages and attorneys' fees . . . and that [t]his Second Interim Award and Injunction deals with the form of injunction. The amount of attorneys' fees and expenses being awarded remains deferred. Jurisdiction is retained pending a final award." It then discussed the propriety of seven proposed injunctions submitted by Susan Wells-

Wilson. As noted by the arbitrator, "[t]he Magwell Respondents, while declining to propose language for an injunction and maintaining that no injunction should be issued, have offered various arguments in opposition to the issuance of an injunction in the form suggested by Claimant." The arbitrator then adopted some of Susan Wells-Wilson's proposed injunctions verbatim, modified some, and declined to give one. In his analysis of the proposed injunction, the arbitrator explained:

> The Interim Award noted that the denial of Claimant[']s rights under Section 6.01 of the Operating Agreement breached the Agreement. The Interim Award also noted that there is therefore no right to reimbursement of fees and expenses under Section 6.05 [indemnity of Managers] of the Operating Agreement and that funds should be restored to Magwell. . . . I do not believe that Mr. Wells has any entitlement to reimbursement under . . . the Operating Agreement for the simple reason that he is not a Manager. Nor do I believe First Nolia is entitled to reimbursement because, to the extent it has acted, it has acted through Mr. Wells and hence, like Mr. Wells, First Nolia is in breach of the Operating Agreement.

He then issued six injunctive orders relating to the right of Magwell's members to vote the shares of Magnolia stock owned by Magwell, the reimbursement of costs, advances, fees, and expenses paid by Magwell related to the arbitration, and the distribution of such recouped amounts to Magwell's owners.

18

On February 12, 2020, based upon an affidavit from Susan Wells-Wilson's attorney establishing the amount of attorney fees and expenses and the appellants' decision to agree to the reasonableness and sufficiency of the evidence to support an award of $805,644.71, the arbitrator issued a "Final Award" incorporating its previous awards and ordering Richard Wells to pay attorney fees in the amount of $805,644.71. Each of the appellants reserved objection to an award of attorney fees to Wells-Wilson generally.

Having summarized the procedural history surrounding the arbitrator's awards, we will now consider whether the trial court erred by failing to vacate the final three awards on the grounds that they were issued more than 30 days after November 1, 2019, the date appellants contend the hearing was closed.

(a) *December 30, 2019 Amended Interim Award*. The Georgia Arbitration Code provides a mechanism for an arbitrator to correct "a mistake in a description of any person, thing, or property referred to in the award." OCGA § 9-9-11 (a) (1). In an order addressing the appellants' objection to Susan Wells-Wilson's request to clarify the use of the word "owners" rather than "Members" in his November 27, 2019 Interim Award, the arbitrator explained that he used the word "owners" on one occasion in the 53-page Interim Award and the word "Members" on five other

occasions; thus, he concluded that this was a mistake that could be corrected pursuant to OCGA § 9-9-11 (a) (1). He also determined that "[w]hen the language is read in the context of the Interim Award, I do not believe anyone could be misled by this error."

While First Nolia asserts this was an improper modification of the Interim Award, we disagree. In our view, the arbitrator was authorized to issue an appropriate and timely change to the award pursuant to OCGA § 9-9-11 (a) (1) (arbitrator may change award to correct a mistake in the description of a person), and he did so within the time allowed by OCGA § 9-9-11 (b) (3) (30 days after service of any objection to request for change in award).

(b) *January 13, 2020 Second Interim Award and Injunction*. Appellants' argument that this award should be set aside is fourfold: (1) after the Interim Award was issued on November 27, 2019, the arbitrator "lost jurisdiction to do anything other than calculate attorney's fees" based upon the doctrine of *functus officio*; (2) the arbitrator was not authorized to make substantive modifications to the November 27, 2019 Interim Award; (3) the arbitrator overstepped his authority by ignoring the parties' agreement about how the case was to proceed; and (4) it must be vacated

because it was issued more than 30 days after the close of the hearing on November 1, 2019.

(i) *Functus officio*. While our research has revealed no Georgia decision applying the *functus officio* doctrine in the arbitration context, federal courts have done so. See, e.g., *SBC Advanced Solutions v. Communications Workers of America, District 6*, 794 F3d 1020, 1031 (II) (B) (8th Cir. 2015). As the Eleventh Circuit Court of Appeals has explained: "This common law rule (meaning 'task performed') provides that, while an arbitrator may correct clerical, typographical, or computational errors in a final award, he has no power to revisit the merits of the award after it has issued." *Intl. Brotherhood of Electrical Workers, Local Union 824 v. Verizon Florida*, 803 F3d 1241, 1245 (I) (11th Cir. 2015). In *Verizon Florida*, the Eleventh Circuit concluded that "regardless of the viability (or advisability)[7] of *functus officio* as a matter of common law, [AAA] Rule 40[8] operated in precisely the

---

[7] The Eleventh Circuit "recognize[d] that some courts have been critical of the doctrine and have opined that an arbitrator *should* have the inherent power to reconsider his award within a reasonable period of time. Nevertheless, it has never been abrogated by any court of which we have been made aware." (Citations and footnote omitted; emphasis in original.) *Verizon Florida*, 803 F3d at 1247-1248 (III).

[8] AAA Commercial Rule 50 is identical to the AAA Rule 40 cited by the Eleventh Circuit, and provides, in pertinent part: "The arbitrator is not empowered to redetermine the merits of any claim already decided."

same manner and precluded the arbitrator here from revisiting the merits of the original award after it was issued." Id. at 1248 (III). Notably, the Eleventh Circuit rejected an argument that an exception to *functus officio* for non-final awards should be applied based upon the Eleventh Circuit's conclusion that the particular award before it was "a final adjudication." Id. at 1247 (III), n.7.

In this case, even if we were to assume, without deciding, that the docrine of *functus officio* applies to arbitration proceedings in Georgia, the arbitrator's November 27, 2019 Interim Award expressly states that the arbitrator had not yet determined the form of injunctive relief. Thus, it was not a final award to which the doctrine should be applied. See generally *Ramirez v. Dept. of Homeland Security*, 975 F3d 1342, 1348-1349 (I) (Fed. Cir. 2020) (noting "that the finality of an otherwise interim award depends at least in part on whether the award states that it is final and whether the arbitrator so intended"). Accordingly, we reject the appellants' argument that the trial court should have vacated the January 13, 2020 Second Interim Award and Injunction based upon the doctrine of *functus officio*.

(ii) *Alleged Substantive Modification*. First Nolia contends that the arbitrator substantively modified the original award by finding First Nolia and Magwell breached the Operating Agreement for the first time in the January 13, 2020 Second

22

Interim Award and Injunction. In its view, this Court should construe OCGA § 9-9-10 (b) and § 9-9-11 together to find that the arbitrator "modified" the award in a manner not authorized by the Georgia Arbitration Code, thereby mandating that it be vacated. First Nolia does not link this particular argument to one of the five statutory grounds for vacating an arbitrator's award, asserting instead that the arbitrator's approach in this case "cannot be squared" with this Court's decisions in *Kent v. Mitchell*, 319 Ga. App. 115 (735 SE2d 110) (2012), and *Conmac Corp.*, supra.

The appellants' citation to *Kent* is misplaced as that case does not address an arbitrator's authority. Instead, it held that a *trial court* was not authorized to make a substantive change to an arbitration award, i.e., changing the party against whom the award was made from a professional corporation to an individual when the individual was never a party to the arbitration. Id. at 116. As the arbitrator pointed out in this case, all of the parties to the arbitration were members of Magwell in addition to being owners.

Our decision in *Conmac Corp.*, supra, is likewise inapposite. In *Conmac*, the arbitration panel issued a *final* award which expressly stated that it "was 'in full settlement' of all claims that had been submitted" and *denied* all claims other than a monetary award. 245 Ga. App. at 895-896 (1) (b). In that particular circumstance, we

23

concluded that the arbitrator had overstepped his authority by modifying a final award in a manner not authorized by OCGA § 9-9-11 (a). Id. at 897 (1) (b). Here, however, the arbitrator's award expressly provided that it was interim and not complete.

To the extent First Nolia's brief can be construed as arguing that the trial court should have vacated the Second Interim Award and Injunction on the ground that the arbitrator "fail[ed] to follow the procedure of [The Georgia Arbitration Code]," OCGA § 9-9-13 (b) (4), we note that this ground does not apply if "the party applying to vacate the award continued with the arbitration with notice of this failure and without objection." OCGA § 9-9-13 (b) (4). In this case, the arbitrator's December 21, 2018 Procedural Order 1, to which no party objected, states: "The arbitrator currently contemplates that an interim award will first be made after which submissions regarding attorneys fees *and any other remaining matters will be made*." (Emphasis supplied.) The time for appellants to object to the arbitrator's proposal to issue interim awards was long before the arbitrator issued his first Interim Award. The arbitrator asked that objections be made to Procedural Order 1 by January 7, 2019, and the record contains no evidence that appellants objected to the arbitrator issuing interim awards by that date or prior to the delivery of the First Interim Award to them. See OCGA § 9-9-10 (b) ("A party waives the objection that an award was

24

not made within the time required unless he notifies in writing the arbitrators of his objection prior to the delivery of the award to him."). Based upon the particular facts and circumstances of this case, we conclude that OCGA § 9-9-10 (b) did not require the arbitrator to issue a final award within 30 days following the purported close of the hearing on November 1, 2019.

(iii) *Alleged Overstepping*. First Nolia contends the arbitrator "overstepped his authority [by] ignor[ing] the parties' agreement about how the case was to proceed." One of the statutory grounds for vacating an arbitrator's award is when there has been "[a]n overstepping by the arbitrators of their authority." OCGA § 9-9-13 (b) (3). As the Supreme Court of Georgia has explained, this statutory "ground *only* comes into play when an arbitrator determines matters beyond the scope of the case." (Emphasis supplied.) *Progressive Data Systems v. Jefferson Randolph Corp.*, 275 Ga. 420, 421 (568 SE2d 474) (2002). "Thus, this ground does not apply where an issue is properly raised before the arbitrator." (Citation and punctuation omitted.) *Berger v. Walsh*, 326 Ga. App. 290, 293 (2) (756 SE2d 545) (2014). In this case, the parties' arbitration agreement authorized the arbitrator to resolve "[a]ny dispute, controversy[,] or claim arising out of or in connection with, or relating to, [the Operating Agreement] or any

breach or alleged breach [thereof]. . . ." As the arbitrator's authority comes from the arbitration agreement, we find no merit in this argument.[9]

(iv) *Issued Over 30 Days after Interim Award.* With regard to the appellants' argument that the January 13, 2020 Second Interim Award and Injunction should have been vacated under OCGA § 9-9-10 (b) because it was issued more than 30 days after the close of the hearing, we find no merit in this contention for the reasons outlined in Division 1 (b) (ii) above.

(c) *February 12, 2020 Final Award.* Based upon the appellants' consent to the bifurcation of the amount of attorney fees, we find that the timing of the final award did not violate OCGA § 9-9-10 (b). Nor do we find any prejudice to appellants based upon the arbitrator's incorporation of previous interim awards into the final award. See *Buchholz v. West Chester Dental Group*, No. CA2007-11-292, 2008 Ohio App. LEXIS 4450 *4 (Ohio Ct. App. October 13, 2008) (lower "court correctly noted that

---

[9] To the extent First Nolia asserts the arbitrator overstepped his authority by failing to follow the AAA Commercial Rules, we note that Rule 8 provides: "The arbitrator shall interpret and apply these rules insofar as they relate to the arbitrator's powers and duties." In a December 30, 2019 Memorandum and Order, the arbitrator rejected the appellants' contention that he lacked jurisdiction to award injunctive relief and concluded that his approach was "indicated by the circumstances of this case and well within my discretion under the rules. The Objections to jurisdiction to render injunctive relief are denied and overruled."

26

in order to vacate the arbitrator's award, it was required to find that appellant was prejudiced by the arbitrator's *delay* in providing the decision, and not merely by the decision itself") (emphasis in original).

2. *Proper Parties to Arbitration.* Richard Wells asserts that the trial court erred by failing to vacate the arbitrator's decision because members of Magwell, such as himself, were not proper parties to an arbitration seeking a declaratory judgment about the Operating Agreement of Magwell. He contends that the arbitrator manifestly disregarded the law in this regard. For the reasons explained below, we disagree.

> [T]o prove that a manifest disregard of the law has occurred, a party wishing to have an arbitration award vacated must provide evidence of record that, not only was the correct law communicated to an arbitrator, but that the arbitrator intentionally and knowingly chose to ignore that law despite the fact that it was correct. . . . [T]his showing is an extremely difficult one to make. . . . [C]lear evidence of the arbitrator's intent to purposefully disregard the law is required. That is, there must be concrete evidence of this intent either in the findings of the arbitrator, if he or she chooses to make such findings, or in the transcript of the arbitration hearing, if the parties choose to have the hearing transcribed.

27

*ABCO Builders*, 282 Ga. at 309. An arbitrator "that incorrectly interprets the law has not manifestly disregarded it. It has simply made a legal mistake." (Citation and punctuation omitted.) Id.

Richard Wells contends that "this case is about whether the LLC or its members may vote LLC-owned stock, nothing more." Susan Wells-Wilson asserts in her brief that the exclusion of Richard Wells and First Nolia from the arbitration would allow them to oppose any effort to enforce any declaration or injunction she obtained against Magwell "precisely because they were non-parties. Cf. OCGA § 9-4-7 (a) ('No declaration shall prejudice the rights of persons not parties to the [declaratory] proceeding.')." (Emphasis omitted.) She also contends that Richard Wells "was also sued as a party to the Operating Agreement, not just as a passive member of Magwell." Additionally, she points out that "this is a case about *which* of Magwell's members have the right to vote the LLC-owned stock: *all* of the members (including majority owners Susan [Wells-Wilson] and Linda [Palmer]), or only the member-manager (i.e., First Nolia, which is controlled by another member, Ric[hard] Wells)." (Emphasis in original.)

Before addressing whether the arbitrator manifestly disregarded the law by keeping Magwell members in the declaratory judgment portion of the arbitration, we

28

will outline additional details about the parties' dispute. On the same day that Magwell was formed in 2008, each of the siblings, as limited partners, and First Nolia, as the general partner, signed a "Consent of Partners to Restructuring and Transfers" according to which Nolia Partnership's shares of stock in Magnolia were transferred to Magwell in exchange for 100 percent of the ownership interests of Magwell; 1,000 ownership units of Magwell were transferred to the partners of the Nolia Partnership in proportion to their ownership of the Nolia Partnership. Accordingly, First Nolia, as general partner, owned 10 units, and each of the three siblings owned 330 units, of Magwell. The Operating Agreement of Magnolia specified that First Nolia, would be its initial manager and stated:

> The business and affairs of the Company [Magwell] shall be managed by the Managers [First Nolia]. Except as otherwise expressly provided in this Agreement, the Managers [First Nolia] shall have full and complete authority, power, and discretion, acting in a fiduciary capacity, to manage and control the business, affairs and properties of the Company [Magwell], to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's [Magwell] business. *Notwithstanding the foregoing, or any other provision of this Agreement, if a Manager [First Nolia], or any other person authorized to act on behalf of a Manager [First Nolia], transfers stock in a corporation which is a "controlled corporation" within the meaning of Code Section 2036 (b)*

*(2) [of the Internal Revenue Code of 1986] to the Company [Magwell], the right to vote with respect to such stock shall be exercised by the Members in proportion to their Ownership interests from time to time, and not by the Manager [First Nolia] (except to the extent of the Manager's Ownership Interest).*

(Emphasis supplied.) Operating Agreement, § 6.01. As the arbitrator explained in his November 27, 2019 Interim Award, the outcome of the arbitration hinged on whether the transfer condition in the italicized language above occurred (hereinafter "6.01 Condition"). Susan Wells-Wilson contended that such a transfer occurred when First Nolia, which is owned and controlled by Richard Wells,[10] transferred the Nolia Partnership stock in Magnolia to Magwell. In her view, persons holding membership interests in Magwell are therefore entitled to vote their Magwell shares in Magnolia at Magnolia board elections.

Susan Wells-Wilson submitted her claim for arbitration after she attempted to vote the Magnolia shares she and Linda owned through Magwell at a 2018 Magnolia shareholders meeting. According to her claim for arbitration, Richard Wells, First Nolia, and Magwell "refused to recognize the legitimacy of the shareholders vote"

---

[10] Richard Wells is the CEO, CFO, and president of First Nolia, in addition to being the majority owner.

and Richard Wells "purported to vote all of Magwell's shares of Magnolia stock in favor of himself [and another] to continue serving as Magnolia's only directors." Richard Wells then "ignored her objection [to his actions] and adjourned the shareholders meeting." Richard Wells is the chair and secretary of Magnolia.

With an understanding of the context for Susan Wells-Wilson's arbitration claim, we now consider Richard Wells' assertion that the arbitrator manifestly disregarded the law by deciding members of the LLC were proper parties to the arbitration. In support of this assertion, he points to OCGA § 14-11-1107 (j), which provides:

> A member of a limited liability company is not a proper party to a proceeding by or against a limited liability company, *solely by reason of being a member of the limited liability company*, except:
>
> (1) Where the object of the proceeding is to enforce a member's right against or liability to the limited liability company; or
>
> (2) In a derivative action authorized by Article 8 of this chapter.

(Emphasis supplied.) He asserts that even though he made the arbitrator aware of this Code section, the arbitrator "ignored it." The record of the proceedings before the arbitrator shows that Richard Wells cited this Code section in one line of his

31

"Dispositive Motion," which raised six separate grounds to dismiss all of Susan Wells-Wilson's claims in the arbitration. He argued that Susan Wells-Wilson could circumvent OCGA § 14-11-1107 (j) only if she showed "cause to pierce the limited liability company's veil to go directly after Wells."

In her response brief in opposition, Susan Wells-Wilson asserted that "[s]electively dismissing some of th[e] parties in an arbitration that is likely to affect the rights of all Magwell members would be a waste of time and would only increase the likelihood of subsequent litigation." She also reiterated that "the question is not whether the members can be held individually liable for Magwell's debts under some sort of veil-piercing theory[.]" After the parties argued the issue in a hearing before the arbitrator, the arbitrator issued a 12-page "Order and Opinion." The arbitrator described the motion before him as seeking dismissal of all four counts in Susan Wells-Wilson's statement of claim in the arbitration, and concluded that "[t]he motion is granted as to Count III; it is denied as to Counts I, II[,] and IV." The order does not explicitly address the argument appellants made with regard to OCGA § 14-11-1107 (j).

In his brief before this Court, Richard Wells focuses primarily upon the merits of whether he was a proper party to the arbitration and devotes little attention to

showing *how* the arbitrator manifestly disregarded the law below. The arbitrator's

order on the dispositive motion was silent with regard to OCGA § 14-11-1107 (j) as

a grounds to dismiss Richard Wells from the arbitration, but did address whether

dismissal of each claim asserted by Susan Wells-Wilson was warranted. Based upon

the particular facts and circumstances of this case, we cannot say that the arbitrator

manifestly disregarded the law by failing to specifically address OCGA § 14-11-1107

(j) in the proceedings before him. As the United States District Court of the Southern

District of New York has pointed out, "an arbitrator's silence on a point does not

necessarily equate to a finding of his having correctly understood and stated the law

and then having proceeded to ignore it in its application." *Dunhill Franchisees Trust*

*v. Dunhill Staffing Systems*, 513 FSupp.2d 23, 32 (II) (A) (2) (S.D. N.Y. 2007). See

also *Bunzl Distrib. USA v. Dewberry*, 16 Fed. Appx. 519, 522 (8th Cir. 2001) ("While

the arbitrator elected to issue a written decision in this case, he didn't specifically

discuss the burden of proof under Missouri law. It therefore cannot be said that it

clearly appears that the arbitrator identified applicable law and proceeded to reach a

contrary position in spite of it.") (citation and punctuation omitted); *Intl. Longshore*

*and Warehouse Union, Local 142 v. Grand Wailea Resort & Spa*, No. 12-00708

ACK-RLP, 2013 U.S. Dist. LEXIS 129175 * 47 (II) (B) (D.Hi. September 10, 2013)

33

("The Court is not allowed to interpret the Arbitrator's silence as a manifest disregard of the law.").

3. *Alleged Personal Liability for Breach of Contract.* Richard Wells asserts that the trial court erred when it authorized the arbitrator to impose breach of contract liability on Magwell members and managers individually. In his view, the arbitrator manifestly disregarded the law and overstepped his authority by holding Richard "Wells personally responsible when Magwell (through First Nolia) refused to distribute its votes to the Magwell member."

Once again, additional facts will be recounted before addressing this claim of error. In her claim before the arbitrator, Susan Wells-Wilson asserted, among other claims for relief, that Richard Wells and First Nolia "breached the Operating Agreement by refusing to recognize [her] right to vote 33% of the shares of Magnolia Stock held by Magwell, based upon her 33% ownership interests in Magwell," as well as her right to vote Linda Palmer's comparable ownership interests as Palmer's proxy. She sought "specific performance to enforce her rights under the Operating Agreement," as well as damages based upon the costs and expenses of the arbitration pursuant to the arbitration clause in the Operating Agreement.

As outlined above, Richard Wells filed a dispositive motion that sought dismissal of Susan Wells-Wilson's breach of contract claim against him, in part, based upon the same arguments he now asserts on appeal. In his order on the dispositive motion, the arbitrator concluded that based upon "the current state of the record, I believe the breach of contract count can be maintained." In the November 27, 2019 Interim Order addressing the merits, the "Relief" portion of the order included no finding that Richard Wells is personally liable to Susan Wells-Wilson for breach of contract. While the arbitrator mentioned in his rendition of the facts that Richard Wells, "as Magnolia secretary, refused to recognize the votes" of Susan Wells-Wilson and concluded that Richard Wells was not entitled to indemnity under Section 6.05 of the Operating Agreement[11] because his "actions were in violation and breach of the Operating Agreement," we cannot say from our review of the

[11] This Section provides in part:
To the fullest extent permitted under Section 14-11-306 . . . or any successor statute, the Company [Magwell] shall indemnify . . . the Managers . . . in respect to any liabilities, damages, losses, costs or expenses incurred by the Managers as a result of any act or omission believed by the Managers in good faith to be within the scope of authority conferred upon them by this Agreement, provided such act or omission was not . . . a transaction for which a Manager received a personal benefit in violation or breach of the provisions of this Agreement or the Manager's obligations to the Company [Magwell].

35

arbitrator's order that the arbitrator found Richard Wells personally liable for breach of contract. Nor does our review of the Final Award reveal any such finding by the arbitrator.[12]

Richard Wells asks this Court to nonetheless overturn the trial court's order because it did not specifically address a non-existent finding by the arbitrator and because its remand direction did not advise "the arbitrator that Wells was not individually liable for a breach of contract. . . ." As the record fails to support Richard Wells' contention that the arbitrator manifestly disregarded the law or overstepped his authority, we find no merit in this enumeration of error.

4. *Lack of Damages for Alleged Breach of Contract.* Richard Wells asserts that the trial court should have vacated the arbitrator's award "because the arbitrator wrongly held Wells liable for breach of contract when Wells-Wilson suffered no damages." We find no merit in this claim of error for the same reasons outlined in Division 3; the arbitrator did not hold Richard Wells liable for breach of contract.

---

[12] While the arbitrator's January 13, 2020 Second Interim Award and Injunction states that Susan Wells-Wilson was "denied rights pertaining to voting the Magnolia Shareholding . . . in breach of the Operating Agreement," this statement was made in the context of declaratory and injunctive relief, not Richard Wells' personal liability for breach of contract.

36

5. *Arbitrator's Interpretation of Voting Rights Condition.* Magwell contends that the trial court should have concluded that the arbitrator overstepped his authority or manifestly disregarded the law by ignoring the Consent and the plain language of the Operating Agreement. With regard to the central issue in this case — whether "a Manager, or any person authorized to act on behalf of a Manager, transfer[red] stock in a corporation which is a 'controlled corporation' within the meaning of Code Section 2013 (b) (2) to the Company" — Magwell asserts that the transfer of stock was made by Nolia Partnership, not a manager of Magwell. In its view, the trial court should have vacated the arbitrator's award because the arbitrator ignored the plain language of the Operating Agreement and the Consent showing that the Nolia Partnership transferred stock to Magwell.

(a) *Overstepping.* Magwell relies heavily upon this Court's decision in *Sweatt v. Intl. Dev. Corp.*, 242 Ga. App. 753 (531 SE2d 192) (2000), to assert that the arbitrator overstepped his authority by interpreting the Operating Agreement and Consent in a manner contrary to the plain language of the documents. In *Sweatt*, we were asked to determine whether an arbitrator overstepped his authority by awarding actual damages for violation of a "contract which permitted only the recovery of liquidated damages." Id. at 755 (1).

37

In the context of *remedies* given by an arbitrator, the Supreme Court of Georgia has stated: "An arbitrator has inherent power to fashion a remedy as long as the award draws its essence from the contract or statutes." (Citation and punctuation omitted.) *MARTA v. Local 732, Amalgamated Transit Union*, 261 Ga. 191, 195 (2) (a) (403 SE2d 51) (1991). See also *Greene v. Hundley*, 266 Ga. 592, 595 (2) (468 SE2d 350) (1996); *Atlanta Gas Light Co. v. Trinity Christian Methodist Episcopal Church*, 231 Ga. App. 617, 619 (2) (500 SE2d 374) (1998) (stating, "[a]s the awards are consistent with the terms of the Agreement and thus reflect the 'essence' of the contract, they do not demonstrate an imperfect execution of the umpire's authority"). Additionally, the Georgia Arbitration "Code specifically states that merely because the relief granted in the arbitration award could not or would not be granted by a court of law or equity is not ground for vacating or refusing to confirm an award." *Greene*, 266 Ga. at 595 (1), citing OCGA § 9-9-13 (d).

In *Sweatt*, this Court paraphrased the holding in our earlier opinion in *Atlanta Gas Light Co.*, and made the following much more general statement: "An arbitration award should be consistent with terms of the underlying agreement and reflect the 'essence' of that contract. . . . Although an arbitrator has some latitude in fashioning remedies, he is not free to ignore the express terms of a valid and enforceable

contract." *Sweatt*, 242 Ga. App. at 755 (1). We then concluded that the arbitrator exceeded his authority by awarding actual damages rather than the liquidated damages mandated by the contract. Id. at 756-757 (1). Following our decision in *Sweatt*, litigants have tried, unsuccessfully, to use the language quoted above to assert that an arbitrator oversteps his or her authority by *interpreting* the parties contract in a manner alleged to be inconsistent with the plain terms of the agreement, as opposed to fashioning a *remedy* not authorized by terms of the contract. See, e.g., *Berger*, 326 Ga. App. at 293 (2) (finding superior court erred by denying confirmation of arbitration award based upon the superior court's erroneous conclusion that the arbitrator "impermissibly construed the unambiguous terms of the release agreements, ignoring their plain language"); *U.S. Intermodal & Thunderbolt Express v. Ga. Pacific Corp.,* 267 Ga. App. 832, 833 (600 SE2d 800) (2004) (rejecting argument that arbitrator overstepped authority because "arbitrator did not correctly interpret the contracts in question"). As we explained in *Berger*,

> the arbitrator exercised the authority granted to him by the parties to determine the applicability of the release agreements. [The appellee] essentially is "arguing that the arbitrator did not correctly interpret the contracts in question. Courts must not decide the rightness or wrongness of the arbitrators' contract interpretation."

39

(Citation and punctuation omitted.) 326 Ga. App. at 294-295 (2).

In this case, the parties' arbitration agreement authorized the arbitrator to resolve "[a]ny dispute, controversy[,] or claim arising out of or in connection with, or relating to, [the Operating Agreement] or any breach or alleged breach [thereof]. . . ." As this language clearly and unambiguously authorized the arbitrator to consider the parties' dispute regarding the Operating Agreement, we find no merit in Magwell's claim that the arbitrator overstepped his authority by so doing. See *Berger*, 326 Ga. App. at 294-295 (2).[13]

As the Eleventh Circuit Court of Appeals recently explained:

Our respect for arbitration . . . means that some interpretive errors will go uncorrected. But if it were any other way, the efficiency gains of arbitration would be destroyed and arbitration would become merely a prelude to a more cumbersome and time-consuming judicial review process. When parties choose arbitration, we cannot override their decision by prioritizing our own answer over that of the arbitrator they

---

[13] The only other authority upon which Magwell relies to show an overstepping by the arbitrator is a general statement in *Southwire Co. v. American Arbitration Assn.*, 248 Ga. App. 226 (545 SE2d 681) (2001), paraphrasing our statement in *Sweatt*, supra, as follows: "the arbitrator may not ignore the plain language of the parties' contract." *Southwire*, 248 Ga. App. at 228 (2). But in *Southwire*, we concluded that the contract language at issue authorized the arbitrator's award of interim relief; this decision does not mandate a different outcome here. Id. at 228-229 (3).

40

selected. And we are called to accept that the costs of allowing interpretive errors to stand are far outweighed by the general benefits that accrue from giving arbitral awards a strong presumption of finality.

(Citation and punctuation omitted.) *Gherardi v. Citigroup Global Markets*, 975 F3d 1232, 1238 (III) (A) (11th Cir. 2020).

(b) *Manifest Disregard*. Relying upon this Court's recent opinion in *Adventure Motorsports Reinsurance v. Interstate Nat. Dealer Svcs.*, 356 Ga. App. 236 (846 SE2d 115) (2020), cert. granted, *Adventure Motorsports Reinsurance v. Interstate Nat. Dealer Svcs.*, No. S21C0008, 2021 Ga. LEXIS 216 (April 5, 2021),[14] Magwell contends that the arbitrator manifestly disregarded the plain language of the contract showing that the entity transferring the shares of Magnolia stock was Nolia Partnership, not Magwell's manager First Nolia. In its view, "[t]he defined, explicit, and clearly applicable law of Georgia is that if a contract is clear and unambiguous, . . . the court simply enforces the contract according to its terms." Therefore, Magwell contends, "[a]n arbitrator cannot, as the arbitrator did here, reject the explicit

---

[14] In its grant of certiorari, the Supreme Court of Georgia stated that it is particularly concerned with whether this Court erred "in reversing the trial court's order confirming the arbitration award[.]"

contractual language to promote his preferred measure of what he perceives as justice."

The appellants made the same argument in their dispositive motion before the arbitrator, which the arbitrator denied based upon his conclusion that he could not determine, from the record presently before him, whether the condition was met when shares in Magnolia were transferred to Magwell. He also found

> that while the Operating Agreement is generally straightforward, the 6.01 Condition is ambiguous. It juxtaposes relatively clear language regarding management and control with a provision that arguably cedes control (but only to a restricted group of people) to avoid the application of the Internal Revenue Code. Based on the submissions of the parties and the matters noted at oral argument, it is clear that the application of the IRC Section 2036 is not always straightforward and indeed that the purpose, meaning and potential application of Paragraph 6.01 of the Operating Agreement is not only contested, but susceptible of differing interpretations.

In the November 27, 2019 Interim Award, the arbitrator did not revisit his finding that the 6.01 Condition was ambiguous, focusing instead upon "discern[ing] the intent of the parties in entering into the Operating Agreement and effectuat[ing] their intent."

As we have previously explained, an arbitrator "that incorrectly interprets the law has not manifestly disregarded it. It has simply made a legal mistake." (Citation

42

and punctuation omitted.) *ABCO Builders*, 282 Ga. at 309. "[T]he concept of manifest disregard has never been the equivalent of insufficiency of the evidence or a misapplication of the law to the facts." (Citation and punctuation omitted.) *Airtab, Inc. v. Limbach Co.*, 295 Ga. App. 720, 722 (2) (a) (673 SE2d 69) (2009). A party seeking to show manifest disregard of the law must present "evidence of a specific intent to disregard the appropriate law." *ABCO Builders*, 282 Ga. at 310. In this case, based upon the totality of the arbitrator's orders, we cannot say that the arbitrator manifestly disregarded the law by concluding that the 6.01 Condition was ambiguous. See *Gainesville Mechanical v. Air Data*, 350 Ga. App. 614, 617 (829 SE2d 838) (2019). Our decision in *Adventure Motorsports Reinsurance*, supra, is distinguishable because in that case we concluded that the arbitrator *explicitly* rejected contract language regarding pricing. 356 Ga. App. at 240. In this case, the arbitrator considered the language at issue and concluded that it was ambiguous.

6. *New Claims Purportedly Raised in Closing Argument*. First Nolia contends that the trial court erred in concluding that the arbitrator could grant relief on claims raised for the first time during closing argument at the end of the evidentiary hearings. Specifically, it asserts that Wells-Wilson argued that Magwell should not be permitted to indemnify Richard Wells and First Nolia for their attorney fees.

43

According to First Nolia, the arbitrator overstepped his authority by addressing the late-raised claim regarding indemnity and finding that Richard Wells and First Nolia are not entitled to indemnity. In support of this claimed error, First Nolia points to AAA Commercial Rule 4 (e), requiring an arbitration filing to include "a statement setting forth the nature of the claim including the relief sought" and AAA Commercial Rule 6 (b) requiring any new or different claim to be made in writing and filed with the arbitrator and providing that "no new or different claim may be submitted except with the arbitrator's consent." In its view, Susan Wells-Wilson should have amended her arbitration claim to assert a derivative action on behalf of Magwell.

The record shows that Susan Wells-Wilson testified in the July 23, 2019 arbitration hearing that she had incurred attorney fees and costs in the arbitration as a result of the appellants' refusal to recognize her voting rights under the Operating Agreement. She acknowledged that the appellants were asking for their fees and costs in the arbitration, and she explained that Richard Wells sent her an email in June 22, 2019, stating that Magwell was paying for Richard Wells' fees with Magwell's "undistributed taxable money," meaning that Susan Wells-Wilson paid taxes on money used to pay for Richard Wells' legal expenses in the arbitration. Finally, she

44

testified that she and Linda Palmer were already sharing the cost of the legal expenses incurred by the appellants in the arbitration in proportion to her and Palmer's ownership interest in Magwell.

During his testimony on July 24, 2019, Richard Wells confirmed that Magwell was retaining $250,000 to pay for attorney fees, that Susan Wells-Wilson and Linda Palmer "will be taxed on the undistributed $250,000 in their pro rata share," and that Magwell was paying for all fees in the arbitration. Finally, he confirmed that he was using the indemnity provision of the Operating Agreement to cover his fees.

In closing argument before the arbitrator in October 2019, Susan Wells-Wilson's attorney

> agree[d] with the Magwell respondents that the arbitrator has the authority to determine the shares of any fees and costs to be awarded based on the relative merits of each party's position. That is to say it is not mandatory to award fees and expenses. . . . In terms of the Magwell respondents' request for an award of attorneys' fees or costs in their favor, I want to address that briefly. . . . In any event, Susan and Linda are already, quote, sharing in the cost and fees of the Magwell respondents' defense in this case by bearing two-thirds of those costs and expenses due to the dividend that was paid to Magwell at the end of last year that Rick did not distribute to his sisters. . . . So who's already paying for the Magwell respondents' defense in this case? Susan and Linda, two-thirds of it. So the idea that there would be an award in

45

Magwell respondents' favor of fees that they already are paying of course is — well, it makes my head hurt. It would be totally and grossly unfair.

Following the closing argument of the attorney for Magwell, First Nolia, and Richard Wells, Linda Palmer's attorney stated that he had "nothing to add regarding the merits of the case" and suggested that Linda Palmer should not participate in the award of attorney fees and expenses in the case "regardless of the outcome." At that point, the arbitrator posed the following question: "Suppose I decided that I should undo in some way the charge of expenses to Magwell, how would that impact Ms. Palmer and the position you're taking?" Linda Palmer's attorney responded that this "would be separate from [the arbitration provision in the Operating Agreement] for the awarding of expenses and that would seem to be more of a functional process for Magwell. And we wouldn't have a position opposing that."[15]

In her post-hearing brief, Susan Wells-Wilson did not assert that Magwell's indemnification of fees and expenses should be set aside. Instead she asserted in a footnote that *if* she should

---

[15] Appellants' counsel made no response to the hypothetical question posed by the arbitrator about undoing the charge of expenses to Magwell. Nor did they address the arbitrator's potential action in this regard in their post-hearing brief.

not prevail, the Arbitrator should decline to award any litigation expenses to the Magwell Respondents, who have already used dividend proceeds that should have been distributed to Magwell's owners to subsidize their defense in this arbitration (including Rick's personal defense, despite the absence of any contractual indemnity rights for members in the Operating Agreement).

Based on our review of the hearing transcript and record, we find no support for First Nolia's claim that Susan Wells-Wilson asserted a new claim for the first time in closing argument that sought to set aside Magwell's contractual indemnity of First Nolia and Richard Wells. Instead, it demonstrates an attempt to mitigate the amount of any cost award in the event the arbitrator found her to be the unsuccessful party. Accordingly, we find no merit in this claim of error.[16]

7. *Arbitrator's Alleged Improper Consideration of Derivative Claims*. In an enumeration of error closely related to that which we resolved in Division 6, Magwell contends that the trial court erred by "remanding derivative action claims for decision by the arbitrator when such derivative claims were not part of the arbitration, Ms.

---

[16] First Nolia's assertion that "the arbitrator overstepped his authority in deciding the merits of the question of whether Magwell was entitled to indemnify First Nolia and Wells and in issuing injunctive relief preventing Magwell from exercising its business judgment to the benefit of its Manager and a member[,]" will be addressed in Division 7, infra.

Wells-Wilson did not have standing to assert them, and the arbitrator overstepped his authority and manifestly disregarded the law by hearing them." In support of this contention, Magwell characterizes the arbitrator's award as "awarding damages to Magwell on a claim it never asserted (recoupment of any legal fees it expended defending First Nolia and Mr. Wells) and then usurping the business judgment of Magwell by *compelling* it to make a cash distribution of any such recouped fees." (Emphasis in original.) It further asserts that while

> [t]he trial court correctly vacated the arbitration award, [it] erroneously remanded the case to the arbitrator to make "a determination of all amounts (costs, advances, fees, or expenses related to the arbitration and any proceedings pertaining to the arbitration) to be reimbursed to Magwell from First Nolia and Wells and distributed to Magwell's members." Because the arbitrator overstepped his authority by ordering the distribution in the first instance, the trial court's order requiring the arbitrator to take new evidence, calculate, and order a monetary distribution after rehearing erroneously and retroactively expands the arbitrator's authority beyond what it was in the first proceeding.

(Footnotes and emphasis omitted.)

(a) *Alleged Derivative Claims*. We first address whether the arbitrator overstepped or manifestly disregarded the law by considering the purported derivative claims. In its November 27, 2019 Interim Award, the arbitrator concluded that Susan

48

Wells-Wilson was "entitled to recover her fees and expenses for prosecuting this matter and the fees and costs paid or advanced to the American Arbitration Association." In a separate numbered division in the "Analysis" section of the award captioned "Rick is obligated to reimburse Magwell," the arbitrator stated in full:

> Section 6.05 of the Operating Agreement would allow Rick as a manager to recover costs and expenses from Magwell except in certain circumstances, including where he has "received a personal benefit in violation or breach of the provisions of this Agreement or the Manager's obligations to the Company." Rick's actions were in violation and breach of the Operating Agreement. He is not entitled to indemnity and must restore to Magwell the amounts he has caused it to pay in connection with this arbitration.

In the "Relief" portion of the Award, the arbitrator concluded, in pertinent part:

> 4. In accordance with Section 10.11 of the Operating Agreement, Susan is entitled to an award of attorneys' fees and expenses against Rick together with fees and charges paid and advanced to the American Arbitration Association. A determination of the amount to be paid by Rick to Susan is deferred.

> 5. Rick is not entitled to indemnity or payment of costs, advances, fees or expenses under Section 6.05 of the Operating Agreement. Rick will be required to reimburse Magwell to the extent he has charged Magwell for costs, advances, fees or expenses related to this

49

> arbitration. This reimbursement will inure to the benefit of all Magwell unit holders, including Linda.

(Footnote omitted.) Following this ruling by the arbitrator, counsel for Richard Wells, First Nolia, and Magwell determined that a conflict existed and new counsel was retained for First Nolia and Magwell.

On December 9, 2019, Susan Wells-Wilson submitted a proposed form of the injunction to be issued and accompanying brief as directed by the arbitrator in Procedural Order 5. In it, she suggested that the arbitrator issue an injunction requiring: (1) both First Nolia and Richard Wells to reimburse Magwell for all fees and costs associated with the arbitration that were paid by Magwell; and (2) Magwell to distribute the reimbursed amounts in proportion to ownership interests.

In a brief filed on December 23, 2019, Richard Wells opposed the first part of the proposed injunction on the following grounds: Susan Wells-Wilson lacked standing to assert this claim for relief on behalf of Magwell; Magwell had not requested such relief in its favor; Susan Wells-Wilson failed to take steps required before a derivative action can be instituted; and it was beyond the scope of the claims she submitted for arbitration. He also asserted that "[t]o the extent that the Arbitrator is giving relief no party requested, it is beyond the Arbitrator's jurisdiction and

50

violates Canon V.A. of The Code of Ethics for Arbitrators in Commercial Disputes[.]" He also argued that an injunction is only available in Georgia when there is no adequate remedy at law; as money damages are a remedy at law, the proposed injunction would be inappropriate. With regard to the proposed injunction requiring Magwell to distribute the money in proportion to ownership interests, Richard Wells contended that it was "wholly outside the scope of the Arbitration," not included in the November 27, 2019 Interim Award, and an impermissible injunction to pay money.

On January 13, 2020, following a hearing in which all parties presented argument for and against these particular injunctions, as well as additional briefing and objections by Richard Wells, the arbitrator issued its Second Interim Award and Injunction. Before issuing the injunctions at the end of the 13-page interim award, the arbitrator addressed the arguments outlined above and concluded that these arguments

> ignore[ ] my obligations under the applicable arbitration clause. It states, in pertinent part:

>> The expenses of arbitration, including the costs of experts, evidence and counsel fees, shall be borne by the unsuccessful or losing party in the dispute, controversy or

51

claim that is settled by such arbitration, or shared as determined by the arbitrator, taking into consideration the relative merits of each party's positions.

Operating Agreement at Section 10.11. The fact that a derivative proceeding may also be an available remedy does not preclude my duty to make a determination relating to allocation of the expenses of the arbitration.

If Respondent Wells, on his own volition or as CEO of First Nolia, obtains reimbursement of attorneys' fees and other expenses of the Arbitration from Magwell, then he will have preempted and frustrated my obligation to allocate fees and expenses. In effect, he will make an award o[f] fees and expenses to himself and First Nolia in advance of my determination. Moreover, he will have, in effect, assessed (and recovered) those fees and expenses against Magwell's owners, including Claimant and the Respondent Palmer, who together own 66% of the beneficial interest in Magwell, and he may have imposed a tax liability on them as well.

This outcome strikes me as at odds with the intention of the parties under the Operating Agreement. The plain language of the Operating Agreement vests the decision regarding who is to pay attorneys' fees and expenses and to whom belongs [sic] in the arbitrator. Under the circumstances, paragraphs 4 and 5 of Claimant's draft will be included.

The arbitrator also stated that "the relevant arbitration clause effectively requires that Magwell be reimbursed for attorneys' fees and other expenses that it has paid, and I am entirely comfortable that this reimbursement can and should be dealt with in an injunction in this Arbitration at this time." Based upon this reasoning, the arbitrator included injunctive relief in the January 13, 2020 Second Interim Award and incorporated it verbatim into the Final Award. The injunctive relief at issue required, in pertinent part: (1) Richard Wells and First Nolia to reimburse Magwell for all fees incurred in connection with the arbitration that were charged to or paid by Magwell; and (2) Magwell to distribute amounts reimbursed to its owners in proportion to their ownership interests.

In this case, the arbitrator expressly stated that he was issuing the injunctive relief pursuant to Section 10.11 of the Operating Agreement (the arbitration clause). While the declaratory relief also included a finding that Richard Wells was not entitled to indemnity based upon a different provision of the Operating Agreement, when construed together with the arbitrator's stated reason for the injunction, we find no support for Magwell's assertion that the arbitrator overstepped his authority and manifestly disregarded the law by ruling upon unasserted derivative claims. As the Sixth Circuit Court of Appeals has recognized, "a mere ambiguity in the opinion

accompanying an award, which permits the inference that the arbitrator may have exceeded his authority is not a reason for refusing to enforce the award. Thus, if there is ambiguity in the legal meaning of an arbitration award, we will construe it in favor of upholding the award." (Citation and punctuation omitted.) *Nationwide Mut. Ins. Co. v. Home Ins. Co.*, 330 F3d 843, 847 (II) (A) (2) (6th Cir. 2003), citing *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U. S. 593, 598 (80 SCt 1358, 4 LE2d 1424) (1960). In this case, the arbitrator's injunction was aimed at ensuring the costs and expenses of the arbitration were borne by the unsuccessful party, not providing relief on unasserted derivative claims.

(b) *Injunctive Relief.* We now turn to the question of whether the arbitrator overstepped his authority or manifestly disregarded the law by issuing injunctive relief relating to the costs and expenses of the arbitration. Magwell contends that the arbitrator overstepped by essentially awarding "monetary damages, albeit uncalculated and without evidence, to Magwell and further order[ing] it to make a cash distribution." In its view, "[t]he arbitrator's usurpation of the business judgment of Magwell's management is shocking."[17] First Nolia points out that the arbitrator

---

[17] The Operating Agreement gave the Managers discretion, if considered advisable while acting in their fiduciary capacity, to distribute cash among the Interest Holders in proportion to their respective ownership interests in such amount

54

improperly enjoined the appellants to pay money, and that the issue before the trial court "was whether the trial court could enforce an injunction that the trial court could not issue itself."

(i) *Overstepping in the Injunction.* As previously explained, overstepping comes into play *only* when an arbitrator determines matters beyond the scope of the case. *Progressive Data Systems*, 275 Ga. at 421. As the arbitrator's injunction was aimed at ensuring the costs and expenses of the arbitration were borne by the unsuccessful party as outlined in the arbitration clause of the Operating Agreement, we cannot say that it was beyond the scope of the case.

(ii) *Manifest Disregard of the Law in the Injunction*. As we previously explained, "[a]n arbitrator has inherent power to fashion a remedy as long as the award draws its essence from the contract or statutes," *MARTA*, 261 Ga. at 195 (2) (a), and the fact that a court "could not or would not" grant the same relief "is not [a] ground for vacating or refusing to confirm an award." (Citation and punctuation omitted.) *Greene*, 266 Ga. at 595 (1). See also OCGA § 9-9-13 (d) ("The fact that the relief was such that it could not or would not be granted by a court of law or equity is not ground for vacating or refusing to confirm the award."). On the other hand, an

_____

and at such times as they may determine.

"arbitrator's manifest disregard of the law" is a statutory ground to vacate, provided a party's "rights" were prejudiced. OCGA § 9-9-13 (b) (5).[18] One commentator posited that "[t]he 'manifest disregard of the law' vacatur ground and the provision allowing arbitrators to fashion their own remedy even though a court of law could not award the same relief are logically inconsistent. . . . How the Georgia Courts will resolve this apparent conflict . . . remains to be seen." Brent S. Gilfedder, "'A Manifest Disregard of Arbitration?' An Analysis of Recent Georgia Legislation Adding 'Manifest Disregard of the Law' to the Georgia Arbitration Code as a Statutory Ground for Vacatur." 39 Ga. L. Rev. 259, 284-285 (Fall 2004). See also Yarn, Georgia Alternative Dispute Resolution: Practice and Procedure in Georgia (3rd ed.), § 9:59, p. 304 ("There is some tension between [the manifest disregard] standard and the broad remedial powers available under the [Georgia Arbitration Code] and AAA rules.") (citations and footnote omitted).

Based on the particular facts and circumstances of this case, we find that the arbitrator fashioned a remedy that drew "its essence from the contract," *MARTA*, 261 Ga. at 195 (2) (a), and was therefore a proper exercise of his authority under OCGA

---

[18] The manifest disregard ground to vacate an arbitration award was enacted after OCGA § 9-9-13 (d). See Ga. L. 2003, p. 820, § 2.

§ 9-9-13 (d). The appellants contend that the arbitrator manifestly disregarded the law by (1) issuing an injunction that a court could not or (2) interfering with Magwell's business judgment with regard to distributions. Given the authority expressly provided to the arbitrator by OCGA § 9-9-13 (d) to fashion its own remedy, which is a more specific statute than OCGA § 9-9-13 (b) (5), we cannot say the arbitrator manifestly disregarded the law by issuing the injunctions at issue. See *Southstar Energy Svcs. v. Ellison*, 286 Ga. 709, 712 (1) (691 SE2d 203) (2010) ("For purposes of statutory interpretation, a specific statute will prevail over a general statute, absent any indication of a contrary legislative intent.") (citation and punctuation omitted).

8. *Alleged Improper Modification of Arbitrator's Award.* First Nolia asserts that the trial court erred in "instructing the arbitrator to take new evidence and modify the awards on remand by fundamentally changing the nature of the relief awarded, when no party requested modification." The record shows that the appellants asserted in the trial court that "[t]he arbitrator overstepped his authority and manifestly disregarded the law when he entered injunctions to pay money damages." See OCGA § 9-9-13 (b) (3) (overstepping); OCGA § 9-9-13 (b) (5) (manifest disregard). The trial court, however, concluded that the award should be vacated on different grounds: OCGA § 9-9-13 (b) (3) (failed to make a final and definite award upon the subject

57

matter) and OCGA § 9-9-13 (b) (4) (failure to follow procedure of the Georgia Arbitration Code). Specifically, the trial court found:

> [T]he Final Award must be vacated insofar as it effectively enjoins Magwell from retaining and paying legal counsel to represent it in this matter *and* fails to identify the amount of fees and expenses incurred on behalf of each of the Respondents. Under the [Georgia Arbitration Code], a party has the right to be represented by an attorney and may claim such right at any time as to any part of the arbitration or hearings which have not taken place. This right may not be waived. OCGA § 9-9-8 (c); see also Ga. Const., Art. 1, § 1, ¶ 12 ("No person shall be deprived of the right to prosecute or defend, either in person or by an attorney, that person's own cause in any of the courts of this state.") Consequently, the court finds that the arbitrator failed to follow the procedure of the [Georgia Arbitration Code] and that Magwell did not have notice of this failure and continue without objection. See OCGA § 9-9-13 (b) (4). Additionally, the findings made by the arbitrator as to [Richard Wells, First Nolia, and Magwell]s' fees and expenses do not include amounts such that the court would be able to confirm the award and enter judgment. See OCGA § 9-9-13 (b) (3) (award shall be vacated where "a final and definite award upon the subject matter submitted was not made").

(Punctuation omitted ; emphasis supplied.) The specific portions of the arbitrator's injunctive relief quoted by the trial court to reach the above conclusions follow:

58

(3) Respondents, D. Richard Wells and First Nolia . . . are permanently enjoined to cause the reimbursement from First Nolia and D. Richard Wells to Magwell of all costs, advances, fees, or expenses related to this arbitration that were incurred by any of the Magwell Respondents and have been charged to or paid by Magwell.

(4) Respondent Magwell . . . is permanently enjoined to cause all amounts reimbursed to Magwell under the preceding paragraph to be distributed to Magwell's . . . owners in proportion to their respective ownership interests in Magwell.

(5) Respondents, D. Richard Wells, Magwell . . . and First Nolia . . . are permanently enjoined from charging any costs, advances, fees, or expenses related to this Arbitration and incurred by Respondents, D. Richard Wells, Magwell . . . and First Nolia . . . (or any of them) to Magwell. If any of these costs, advances, fees, or expenses are nevertheless charged to or paid by Magwell . . . they are to be promptly reimbursed and distributed in accordance with paragraphs 3 and 4 above.

(6) Without the authorization of a court exercising jurisdiction, Respondents D. Richard Wells, Magwell . . . and First Nolia . . . are permanently enjoined from charging to Magwell . . . any costs, advances, fees, or expenses related to any proceedings pertaining to this Arbitration (including any proceedings to confirm, modify, or vacate any awards issued in this arbitration) and incurred by Respondents, D. Richard Wells, Magwell . . . and First Nolia . . . (or any of them). If any

of these costs, advances, fees, or expenses are nevertheless charged to or paid by Magwell without the authorization of a court exercising jurisdiction, they are to be promptly reimbursed and distributed in accordance with paragraphs 3 and 4 above.

The trial court vacated the arbitrator's award in its entirety[19] and ordered the following issues "be reheard and decided":

1. A determination of all amounts (costs, advances, fees, or expenses related to the arbitration and any proceedings pertaining to the arbitration) paid or incurred by Magwell on its own behalf.

2. A determination of all amounts (costs, advances, fees, or expenses related to the arbitration and any proceedings pertaining to the arbitration) to be reimbursed to Magwell from First Nolia and Wells and distributed to Magwell's members.

---

[19] The trial court did so based upon its belief that it had no authority to vacate an award in part, quoting *SCSJ Enterprises v. Hansen & Hansen Enterprises*, 306 Ga. App. 188, 189 (702 SE2d 12) (2010), as follows: "the law of this State requires that, if a trial court vacates an arbitration award, it may do so only in its entirety." Because Susan Wells-Wilson has not filed a cross-appeal asserting that the trial court erred by failing to confirm the portions of the award with which it had no issue, the propriety of the trial court's decision to vacate the entire award with an instruction for a partial rehearing is not before us in this case. See Yarn, supra, § 9:59, p. 295 ("Georgia courts have remanded matters for rehearing on the limited portion of the award which caused vacatur. Judicial economy and the pro-arbitration intent of the [Georgia Arbitration Code] would seem to dictate that this practice would be followed; however, the courts have been known to vacate the entire award on the basis of an otherwise severable faulty portion.") (citations and footnotes omitted).

60

3.   That portion of the award enjoining Magwell from incurring further fees and expenses in this matter, in a manner consistent with this Order.

Appellants assert, through their incorporation of each other's arguments and briefs, that "[t]he trial court correctly vacated the arbitration award, but erroneously remanded the case to the arbitrator to make 'a determination of all amounts . . . to be reimbursed . . . and distributed'" and that "[t]he trial court's [above] vacatur of the arbitration award has not been appealed — the only issues on appeal are whether the trial court should have vacated on additional grounds and ordered a broader or different rehearing." As the trial court's rehearing direction for a determination of amounts is inextricably intertwined with its stated grounds for vacating the arbitrator's award, we cannot consider the propriety of one without the other.

There is scant Georgia case law addressing the lack of "a final and definite award upon the subject matter submitted." OCGA § 9-9-13 (b) (3). Other jurisdictions addressing this ground for vacating an arbitrator's award have stated:

> The general rule is that in order for an award to be final and definite, it must resolve all issues submitted to arbitration, and determine each issue fully so that no further litigation is necessary to finalize the obligations of the parties under the award. *Puerto Rico Maritime Shipping v. Star Lines, Ltd.*, 454 FSupp. 368, 372 (S.D. N.Y. 1978). An award must also

61

be clear enough to indicate what each party is required to do. *Curacao v. Solitron*, 356 FSupp. 1, 12 (S.D. N.Y.) (1973), aff'd, 489 F2d 1313, cert. denied, 416 U. S. 986 (94 SCt 2389, 40 LE2d 763) (1974).

(Punctuation omitted.) *Dighello v. Busconi*, 673 FSupp. 85, 90 (B) (3) (D.Conn. 1987). See also *Resch v. Catlin Indem. Co.*, No. 19-8699 (KSH) (CLW), 2020 LEXIS U.S. Dist. LEXIS 50235, *6 (D.N.J. March 23, 2020). And, "[t]he mere fact that certain acts were to be performed in the future to effectuate the [a]rbitration [p]anel's primary rulings does not make the nonmonetary relief any less 'final' or 'definite' than the monetary relief." *Dighello*, 673 FSupp. at 91 (B) (3). Accordingly, one jurisdiction has upheld an award that was "remedial in nature, . . . not expressly or implicitly prohibited by the terms of the arbitration agreement, and . . . well within the arbiters' authority and discretion to fashion appropriate relief under their broad mandate to resolve 'all disputes' between the parties." Id. See also *Benistar Employer Svcs. Trust Co. v. Benincasa*, 207 A3d 67, 81 (III) (Conn. App. 2019) ("The absence of a specific dollar figure does not render the rights and obligations in doubt as to who is entitled to receive or pay the damages. The award provides sufficient guidance from which the parties may identify the specific amounts of payments."). On the other hand, when an arbitration panel's award "expressly" leaves an award "open for

62

judicial determination," it is subject to being vacated based upon a lack of finality. *Gas Aggregation Svcs. v. Howard Avista Energy*, 319 F3d 1060, 1069 (II) (E) (8th Cir. 2003).

While the lack of an amount was not necessarily fatal to the arbitrator's award in this case, numbered paragraph (3) of the *arbitrator's* injunctive relief in the Final Award failed to provide a specific formula for First Nolia and Richard Wells' obligation to reimburse Magwell. In a case in which one law firm represented all three appellants through at least the November 27, 2019 Interim Award, this lack of specificity renders the award indefinite as to which portion of the total amount paid to the law firm during that time must be reimbursed by First Nolia and Richard Wells. Additionally, numbered paragraph (6) of the arbitrator's injunctive relief in the Final Award is contingent upon court authorization and lacks finality. Simply put, the award did not determine the issue "fully so that no further litigation is necessary to finalize the obligations of the parties under the award." *Dighello*, 673 FSupp. at 90 (B) (3). Accordingly, the trial court did not err by vacating the arbitrator's award on the statutory grounds stated in its order.

Our analysis does not end here, however, as the trial court's rehearing order required the arbitrator to make a specific determination of described amounts. As this

direction requires the arbitrator to find an amount, which, as outlined above, is not always necessary for an arbitrator's award to be final and definite, we vacate numbered paragraphs (1) and (2) of the *trial court's* order and remand with direction for the trial court to order a rehearing on the issue of the "expenses of the arbitration" in Section 10.11 of the Operating Agreement.[20]

For the reasons outlined above, we find no merit in First Nolia's contention that the trial court erroneously *modified* the arbitrator's award in the absence of grounds provided by OCGA § 9-9-14 (b). The issue of the "expenses of the arbitration" was clearly within the purview of the arbitrator's authority, and the trial court was authorized to vacate the arbitration award for the reasons we have explained. Accordingly, we disagree with First Nolia's assertion that the issue was "not part of the original case."

We also find no merit in First Nolia's contention that the authority to order a rehearing after vacating an arbitrator's award pursuant to OCGA § 9-9-13 (e) should not be used as "an end-run around" the requirements for trial court modification

---

[20] With regard to numbered paragraph (3) of the trial court's order for a rehearing, none of the appellants take issue with it, and Susan Wells-Wilson has not filed a cross-appeal on any ground. We therefore do not address the propriety of the trial court's order for a rehearing on "[t]hat portion of the award enjoining Magwell from incurring further fees and expenses in this matter. . . ."

found in OCGA § 9-9-14. In its view, these Code sections should be construed together to preclude a trial court from ordering

> an arbitrator to modify relief on remand. Instead, the trial court can direct the arbitrator only to drop the remedy from the award as unenforceable. In other words, if a trial court cannot confirm an award containing an unenforceable remedy, then the trial court should vacate the award, and if remand is needed, then remand with instruction not to impose the remedy.

We disagree with First Nolia's proposed construction of the Georgia Arbitration Code. The limited grounds for modification in OCGA § 9-9-14 (b) allow a court to *confirm* an arbitration, and the circumstances which allow a court to modify are completely different from the grounds mandating that a trial court vacate an arbitrator's award and order a rehearing.

9. *Remand to Same Arbitrator.* First Nolia argues that the trial court erred "in remanding to the same arbitrator." In support of this claimed error, First Nolia contends that the trial court did not apply the proper standard when deciding to return the case to the same arbitrator and that application of the proper standard mandates the conclusion that the case should be sent to a new arbitrator for any rehearing. We disagree.

65

In the hearing on the motion to confirm/vacate the arbitration award, the trial court advised the parties before issuing its written ruling that the case would go back to the same arbitrator based on its "find[ing] that the arguments that have been made that the arbitrator is somehow biased on behalf of the Claimant to be not substantiated in the record." The trial court's subsequent written order cites the same standard with regard to partiality of an arbitrator that First Nolia contends it failed to follow:

> As to the degree of partiality required in order to vitiate [an] award, it has been held sufficient that the relationship between the arbitrators and one of the parties is of such a nature as to give clear grounds for suspicion of their proceedings and render it unlikely that they constituted the fair and impartial tribunal to which the other party is entitled. *Torres v. Piedmont Builders*, 300 Ga. App. 872, 873 [(686 SE2d 464)] (2009).[21]

(Punctuation omitted.) While this statement was made in the context of the arbitrator's partiality in issuing the award, it demonstrates that the trial court was aware of the standard.

Rather than relying on the trial court's written order to show the trial court applied the incorrect standard, First Nolia points to statements made by the trial court

---

[21] See also *Edwards v. Employers Mut. Liability Ins. Co.*, 219 Ga. 121, 124-125 (132 SE2d 39) (1963).

in the hearing on the motion to confirm/vacate the arbitration award. Construing the trial court's written order as a whole, along with its statements in the hearing, we find no merit in First Nolia's contention that the trial court applied the wrong standard when it decided to return the case to the same arbitrator. We likewise find no merit in First Nolia's remaining arguments that the trial court should not have returned the case to the same arbitrator based upon alleged grounds for suspicion that he would not be a fair and impartial tribunal in the rehearings.

10. *Award of Expenses for Court Activity*. In the remaining enumeration of error submitted for our consideration, First Nolia contends that the trial court's order erroneously directs the arbitrator to award fees, costs, and expenses incurred in connection with "court activity." Based upon our holding in Division 8, this enumeration is moot.

11. *Conclusion.* For the above-stated reasons, we affirm the trial court's decision to vacate the arbitrator's award, vacate numbered paragraphs (1) and (2) of that portion ordering a rehearing, and remand with direction for the trial court to order

a rehearing on the issue of the "expenses of the arbitration" in Section 10.11 of the Operating Agreement.[22]

*Judgment affirmed in part, vacated in part, and remanded with direction in all three cases. Doyle, P. J., and Reese, J., concur.*

---

[22] A final note regarding the length of this opinion. As a federal district court observed:

> The length of this opinion is due to the nature and the number of charges made by the [appellants]. . . . While it still remains true, that as long as even a glint of hope remains for judicial interference with the merits of an arbitration award, we must regretfully anticipate continued efforts to press contentions similar to that rejected here, hopefully this case may persuade others from pursuing such efforts.

(Citation and punctuation omitted.) *Hunt v. Mobil Oil Corp.*, 654 FSupp. 1487, 1520 (S.D. N.Y. 1987).